**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**BID PROTEST**

| | |
|---|---|
| **HII SHIPCYCLE, LLC,**<br>*Plaintiff*,<br>v.<br>**UNITED STATES,**<br>*Defendant*. | **Redacted Version**<br><br>Case No. ________<br>Judge ___________<br>[redacted] |

## [redacted] COMPLAINT

For its bid protest complaint against the United States, HII ShipCycle, LLC ("ShipCycle") alleges as follows:

## NATURE OF THE ACTION

1. ShipCycle protests the decision of the United States Department of the Navy ("Navy") to award the Ex-Enterprise CVN-65 Dismantlement and Disposal Contract, Solicitation No. N00024-25-R-4135 (the "Solicitation"), to NorthStar Maritime Dismantlement Services, LLC ("NorthStar"). This protest follows ShipCycle's successful protest of the same procurement in COFC Case No. 25-1336.

2. Although NorthStar has had more than a year since its initial award to prepare to perform work (and, for part of that time, actually perform) under this contract, it continues to lack a facility to receive and safely deconstruct the Ex-Enterprise. The significant and necessary expansion of its proposed dismantlement facility remains unfinished, with necessary permits obtained only a few months ago. And another large ship occupies the space needed for

[redacted]

performance—complicating and likely blocking the arrival of the Ex-Enterprise and delaying a portion of the shipyard's required expansion work for the arrival of the Ex-Enterprise.

3. It was unreasonable for the Navy—which was aware of all these facts—to determine that NorthStar's proposed technical approach was acceptable and that its high-risk solution posed no worse than moderate risk to performance. But for this evaluation error, and the others detailed below, there was a substantial likelihood that ShipCycle would have been awarded the contract.

## PARTIES

4. ShipCycle is a Delaware limited liability company and is a joint venture between EnergySolutions Federal Support, LLC and HII Nuclear Inc. ShipCycle has its principal place of business at 11815 Fountain Way, Suite 500, Newport News, Virginia 23606.

5. Defendant is the United States, acting through the U.S. Department of the Navy.

## JURISDICTION

6. The Court has jurisdiction over this post-award protest pursuant to the Tucker Act, which gives the U.S. Court of Federal Claims jurisdiction to "render judgment on an action by an interested party objecting to … a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1).

7. ShipCycle is an interested party to pursue this protest because it was an actual offeror for the Ex-Enterprise CVN-65 Dismantlement and Disposal Contract and, but for the Navy's erroneous and flawed evaluation, ShipCycle had a substantial likelihood of receiving the contract award. *See* 28 U.S.C. § 1491(b)(1).



[redacted]

## BACKGROUND

8. The USS Enterprise (now referred to Ex-Enterprise or CVN-65) was the Navy's first nuclear-powered aircraft carrier. Commissioned in 1961, the Ex-Enterprise played a central role in U.S. naval operations spanning the Cold War, Vietnam War, and post-9/11 conflicts, including Operations Enduring Freedom and Iraqi Freedom. In 2017, after more than 50 years of operations, the Ex-Enterprise was officially decommissioned by the Navy.

9. The Ex-Enterprise contained a number of reactor and propulsion plants. As part of the decommissioning process, the Navy removed the fuel from the aircraft carrier, rendering the Ex-Enterprise retired. Currently, the Ex-Enterprise sits pier-side at Huntington Ingalls Industries, Inc.'s Newport News Shipbuilding in Newport News, Virginia. The Solicitation sought support in completely dismantling and disposing of the Ex-Enterprise.

### The Solicitation's Requirements

10. Prospective offerors were instructed to submit a proposal detailing their approach to each of the Solicitation's requirements. The Solicitation told offerors to submit their proposals in four volumes: Volume I – Standard Form 33 Solicitation Set/Model Contract; Volume II – Technical Proposal; Volume III – Price Proposal; and Volume IV – Past Performance.

11. The Solicitation informed offerors the Navy would evaluate proposals against Mandatory Compliance criteria. The Navy was to review these criteria for completion but would not rate offerors' proposals against the criteria. The Solicitation notified offerors that "[a]ny Offeror who does not submit all the requirements may not, at the discretion of the Government, be evaluated further and will be ineligible for award on the basis of initial offers."

12. The Navy would also evaluate proposals against three factors: Factor 1 – Technical/Management Approach; Factor 2 – Past Performance; and Factor 3 – Total Evaluated Price.



[redacted]

13. The Navy was to evaluate Factor 1 on an Acceptable/Unacceptable basis. Factor 1 consisted of six elements: (1.1) Vessel Dismantling Capability and Technical Approach; (1.2) Management Capability and Approach; (1.3) Small Business Utilization/Participation; (1.4) Environmental Management; (1.5) Safety and Health Management; and (1.6) Emergency Response.

14. Under Elements 1.1 and 1.2, the Navy was to evaluate the extent to which an offeror's proposal demonstrates an offeror's understanding of approach to and capability for controlling and integrating the diverse technical and production efforts required by the statement of work. This included assessing proposals for the extent to which an offeror has a comprehensive, integrated, and engineered plan capable of executing the vessel disposal and dismantling process in accordance with all Federal, State, and local laws and regulations. Additionally, the Navy was to assess the extent that an offeror "has the adequate facilities and labor force needed to accomplish" the Solicitation's requirements "in an efficient and safe manner and in a manner protective of the environment."

15. Under Element 1.3, the Navy was to evaluate the degree to which an offeror understood the small business requirements and an offeror's planned approach to meet its stated goal.

16. Under Elements 1.4 and 1.5, the Navy was to assess proposals for environmental, safety, and health management factors and approaches.

17. Under Element 1.6, the Navy was to assess proposals for emergency response factor approaches and capabilities.

18. After assessing each of these elements, the Navy was to apply the following definitions of acceptable or unacceptable.



[redacted]

| Rating | Description |
|---|---|
| Acceptable | Proposal meets requirements and indicates an adequate approach and understanding of the requirements and risk of unsuccessful performance is no worse than moderate. |
| Unacceptable | Proposal does not meet requirements of the solicitation and thus, contains one or more deficiencies and is unawardable, and/or risk of performance is unacceptably high. |

19. The Solicitation contemplated the Navy would evaluate Factor 2 based on two considerations: relevancy of past performance and how well an offeror performed that work. The Navy was to evaluate relevancy of past performance efforts to determine if they were Very Relevant, Relevant, Somewhat Relevant, or Not Relevant, as summarized below:

| **Past Performance relevancy Rating Method** | |
|---|---|
| Rating | Description |
| Very Relevant | Present/past performance effort involved essentially the same scope and magnitude of effort and complexities this solicitation requires. |
| Relevant | Present/past performance effort involve similar scope and magnitude of effort and complexities this solicitation requires. |
| Somewhat Relevant | Present/past performance effort involved some of the scope and magnitude of effort and complexities this solicitation requires. |
| Not Relevant | Present/past performance effort involved little or none of the scope and magnitude of effort and complexities this solicitation requires. |

20. The Solicitation informed offerors that more relevant past performance will typically be a stronger predictor of future success and have more influence on the confidence assessment rating assigned than past performance of lesser relevance.

21. In considering relevancy, the Navy was to give greater consideration to past performance on contracts that involved the same or similar type of work (in both type and complexity) required by the solicitation in the following priority of relevance: Ship dismantling that included hazardous material/waste removal and disposal; Ship repair that included hazardous material/waste removal and disposal; Facility dismantling that included hazardous material waste removal and disposal; and Ship building that included hazardous material/waste removal and disposal.



[redacted]

22. The Navy could, at its discretion, consider past performance of major subcontractors.

23. As to the second consideration, the Navy could, in its sole discretion, consider information from outside an offeror's proposal, including considering information based on its own experience with an offeror or contacting parties for whom an offeror performed contracts and consider responses from those parties. The Solicitation notified offerors, notwithstanding this discretion, that the Navy intended to review Contractor Performance Assessment Reporting System ("CPARS") ratings and other existing past performance information on relevant contracts.

24. The Navy would also consider general trends in a contractor's relevant performance.

25. The Navy was to establish a performance confidence rating based on an offeror's overall record of recency, relevancy, and quality of performance, as summarized below:

| **Performance Confidence Assessments** | |
|---|---|
| Rating | Description |
| Substantial Confidence | Based on the offeror's recent/relevant performance record, the Government has a high expectation that the offeror will successfully perform the required effort. |
| Satisfactory Confidence | Based on the offeror's recent/relevant performance record, the Government has a reasonable expectation that the offeror will successfully perform the required effort. |
| Limited Confidence | Based on the offeror's recent/relevant performance record, the Government has a low expectation that the offeror will successfully perform the required effort. |
| No Confidence | Based on the offeror's recent/relevant performance record, the Government has no expectation that the offeror will be able to successfully perform the required effort. |
| Unknown Confidence (Neutral) | No recent/relevant performance record is available, or the offeror's performance record is so sparse that no meaningful confidence assessment rating can be reasonably assigned. |

26. Finally, Factor 3 would be evaluated for reasonableness. Award was to be made to the "responsible Offeror whose proposal represent[ed] the best value to the Government."



[redacted]

**Prior Award and Protest**

27. On May 30, 2025, the Navy eliminated ShipCycle from the competition, finding that ShipCycle's final revised proposal was submitted after the deadline set for receipt of revised proposals. Although ShipCycle had alerted the Navy to technical difficulties it experienced with the Navy's electronic proposal submission system and timely had requested an extension of the upcoming submission deadline, the Navy did not consider or even respond to ShipCycle's timely request. The Navy instead rejected ShipCycle's proposal and awarded the Contract to NorthStar.

28. ShipCycle subsequently filed a protest at the Court, challenging its exclusion from the competition.

29. On February 19, 2026, the Court sustained ShipCycle's protest, holding that the Navy's failure to consider ShipCycle's extension request was arbitrary and capricious. The Court ordered the Navy to permit offerors to submit new final proposal revisions ("FPRs") and to make a new source selection decision based on the FPRs, or take such other actions as consistent with the order.

**Re-Evaluation and Re-Award to NorthStar**

30. Following the Court's decision and order, on March 27, 2026, the Navy extended the submission deadline for FPRs to ShipCycle and two other offerors, including NorthStar. None of the Solicitation requirements materially changed.

31. On April 24, 2026, ShipCycle timely submitted its revised proposal.

32. On June 17, 2026, the Navy opened discussions.

33. During discussions, the Navy stated that it was considering two potential towing schedules. Under the first schedule, if the Navy were to award the contract in mid-July, the Ex-Enterprise would arrive at the awardee's facility in mid-August 2026. Alternatively, the Navy stated it could delay the tow to avoid seasonal hurricane risks, with the Ex-Enterprise arriving at



[redacted]

the awardee's facility no earlier than November 2026. ShipCycle confirmed its facility was ready to receive the vessel under either schedule.

34. ShipCycle timely submitted its FPR on June 25, 2026.

35. On July 15, 2026, the Navy notified ShipCycle that it had selected NorthStar again for award.

36. ShipCycle timely requested a post-award debriefing. The Navy provided ShipCycle a written post-award debriefing and a redacted Source Selection Decision Determination on July 22, 2026. ShipCycle timely submitted enhanced debriefing questions, which the Navy responded to on July 31, 2026.

37. The debriefing shows that, after learning the rough value of ShipCycle's initial proposed price through the public decision in the first protest, NorthStar dramatically lowered its price [redacted]. [redacted].

38. The Navy summarized the ratings and total evaluated price of NorthStar and ShipCycle as follows:

| Offeror | Factor 1: Technical/ Management Approach | Factor 2: Past Performance | Factor 3: Price |
|---|---|---|---|
| NorthStar Maritime Dismantlement Services, LLC | Acceptable | Substantial Confidence | $418,497,668 |
| HII ShipCycle, LLC | [redacted] | | |

*Id.* at PDF 1. NorthStar's new proposal slashed nearly $120 million from its prior awarded price of $536,749,731, [redacted]. NorthStar's new price



[redacted]

[redacted].

39. This enormous ($120M or 28%) reduction in NorthStar's price with no change in solicitation requirements—and with the added burden of attempting to significantly modify its facility to receive the Ex-Enterprise—calls into question NorthStar's ability to perform the contract at its new price.

40. As of the date of this protest, another ship, the S.S. United States, remains moored in NorthStar's proposed deconstruction facility, in exactly the same place where it was for the duration of the last protest. This is why ShipCycle's last complaint stated that NorthStar was unable to commence work for several months, at the earliest. And, as of this date, the significant modifications that ShipCycle argued in the last protest would be needed before NorthStar's facility could receive the Ex-Enterprise remain incomplete.

41. Although the Government and awardee complained about the delay that the last protest supposedly caused to performance of the contract, NorthStar to this day remains unable even ***to receive*** the Ex-Enterprise, much less commence its safe deconstruction. And that is true despite the passage of more than a year since the Navy first awarded the contract to NorthStar, and despite NorthStar's ability to use the entirety of the last protest period and corrective action period to attempt unsuccessfully to enable itself to meet the contract's requirements. That is why the Ex-Enterprise remains moored in Virginia even after the second award.

42. This protest follows.

## <u>COUNT I</u>
### (THE NAVY UNREASONABLY DETERMINED NORTHSTAR'S PROPOSAL WAS TECHNICALLY ACCEPTABLE)

43. ShipCycle incorporates the preceding paragraphs as if set forth fully herein.



[redacted]

44. The Navy should have found NorthStar's proposal technically unacceptable because its proposed facility could not receive the CVN65 at the time of proposal submission without significant and material alterations (and still cannot receive the ship today), posing an unacceptable level of risk that the Navy failed to consider when it evaluated final FPRs.

45. The RFP required offerors to demonstrate that the proposed facility could safely accommodate the CVN-65 for dismantlement and recycling activities. Specifically, the RFP instructed offerors to provide information "to demonstrate the facilities and equipment are adequate to accomplish the requirements of the solicitation[.]" Pursuant to this requirement, offerors were to "[d]escribe the facility to be utilized including available space for mooring the vessel, piers, dry-docks, and/or marine rails and/or slips" as well as a description of the "water depth, accessibility, capacity, any maintenance or dredging requirements, and the ability to safeguard the vessel during severe weather such as hurricanes and flooding."

46. NorthStar's proposed facility falls far short of meeting these requirements or being able safely to receive a decommissioned aircraft carrier. NorthStar proposed the facility of its teammate, Modern American Recycling and Radiological Services, LLC ("MARRS"). The MARRS facility, however, lacked—at the time of the submission of the June 25, 2026, FPR deadline; at the time of the technical evaluation; and even today—the necessary improvements, new dredging, construction, and regulatory approvals necessary to make the facility ready to receive the CVN-65.

47. Public documents demonstrate the MARRS facility could not have been ready at the time of the June 25, 2026, FPR submission. For example, as ShipCycle brought to the Court's attention in the prior litigation, a U.S. Army Corps of Engineers' September 2025 public notice identified a requested major construction and dredging project at the MARRS facility that was to



[redacted]

upgrade and dredge the location "to meet current and future contract obligations to support the dismantlement of the Ex-Enterprise (CVN65)." The notice identified substantial work needed for the MARRS facility to even be deemed technically acceptable. Such work included dredging 177,500 cubic yards, removing or modifying existing marine infrastructure, and reconstructing 780 feet of bulkhead.

48. During corrective action, and prior to submission of corrective action proposals, ShipCycle sent a letter of concern to the contracting officer. The letter highlighted the ongoing unavailability of the MARRS facility to receive the Ex-Enterprise or meet other mandatory performance requirements and the relevant Solicitation provisions that called for the evaluation of these risks. Thus, there can be no doubt the Navy was aware of the lack of readiness and risk in the proposed MARRS facility.

49. ShipCycle understands that, following the conclusion of the last protest, MARRS finally obtained a permit to even begin this significant work. As of the filing of this protest, the work is still underway. Moreover, the S.S. United States remains moored at the MARRS facility, where it has been since before the first contract award. Not only does the presence of the S.S. United States complicate and likely physically prevent receipt of the Ex-Enterprise, but it also likely prevents portions of the significant and necessary facility expansion work to occur until the S.S. United States is removed from the facility.

50. All of this means receipt of the ship by the Navy's preferred mid-August date was impossible. It remains to be seen when the major modification work will be complete, when the S.S. United States will be removed from MARRS facility, and when NorthStar will be able to receive the ship or safely begin its deconstruction. NorthStar was not prepared to receive the ship upon this most recent contract award, just as it was unable to receive it at the time of the first award



[redacted]

more than a year ago. These facts also demonstrate that ShipCycle's last protest did not delay deconstruction of the Ex-Enterprise: for reasons entirely unrelated to ShipCycle, NorthStar's proposed facilities were unable to receive the ship prior to the last protest, during the last protest, and even now, more than a year after the last protest was filed.

51. The significant expansion and modifications that the MARRS facility required (and still requires) to satisfy contract requirements, as well as the string of contingencies that had to line up perfectly to have a chance of making the facility even minimally acceptable for deconstructing a nuclear aircraft carrier, represented a high risk of unsuccessful performance. Under the terms of the Solicitation, a proposal was eligible for a Technical rating of Acceptable only if it posed "no worse than moderate" risk of unsuccessful performance.

52. Consequently, the Navy should have found NorthStar's proposal to be technically unacceptable because the proposal and the information before the Navy demonstrated a greater than moderate risk of unsuccessful performance. The Agency's apparent finding to the contrary was arbitrary and capricious in light of the facts before it.

53. But for the Navy's unreasonable assessment, ShipCycle would have had a substantial chance at award because [redacted] as opposed to NorthStar's Unacceptable rating. ShipCycle was thus prejudiced by the Navy's arbitrary and capricious evaluation. The Court should, thus, sustain this protest.

**COUNT II**

**(THE NAVY FAILED TO RECOGNIZE SHIPCYCLE'S [redacted] PAST PERFORMANCE)**

54. ShipCycle incorporates the preceding paragraphs as if set forth fully herein.

55. The Solicitation established a best-value tradeoff in which Past Performance was a significant evaluation factor—one designed to give the Government higher confidence that the selected contractor would successfully perform the contract.



[redacted]

56. [redacted].

57. However, the Navy purports to have looked beyond those identical confidence ratings to identify "distinctions" in NorthStar's past performance record—distinctions the Navy contends made NorthStar's past performance [redacted] and justified selecting NorthStar's proposal for award despite ShipCycle's [redacted] past performance. Based on these alleged distinctions, the Navy erroneously concluded that NorthStar's Substantial Confidence past performance was [redacted] ShipCycle's [redacted] past performance.

58. It is unclear from the debriefing materials what "distinctions" the Navy identified in NorthStar's past performance; however, ShipCycle's past performance record demonstrably [redacted].

59. ShipCycle submitted [redacted].

The Navy evaluators summarized ShipCycle's four past performance contracts as follows:

[redacted]



[redacted]

[redacted]



[redacted]

[redacted]

60. The Solicitation stated, "More relevant past performance will typically be a stronger predictor of future success and have more influence on the confidence assessment rating assigned than past performance of lesser relevance."

61. NorthStar and its team have never decommissioned, dismantled, and disposed of a nuclear-powered ship (as ShipCycle's team has done), or fully dismantled a U.S. Navy aircraft carrier (as ShipCycle's team has done multiple times). NorthStar, further, lacks a Master Ship Repair Agreement, and it has no significant Navy depot-level maintenance availabilities or major Military Sealift Command overhauls. Public records further show that NorthStar's team, unlike ShipCycle's team, has not received any major Navy ship repair contract award.

62. It is public knowledge that NorthStar has performed some facility dismantlement projects—Crystal River Nuclear Plant Unit 3 ("Crystal River") and the Vermont Yankee Nuclear Power Station ("Vermont Yankee"), which would be relevant to this procurement. But those projects cannot objectively result in a finding of confidence. Public records demonstrate NorthStar has been the subject of a total of five violations at both Crystal River and Vermont Yankee,



[redacted]

including two fire violations. In one instance, NorthStar was unaware of a fire at Crystal River for a period of time, and it only discovered this fire by pure happenstance—a passerby who alerted NorthStar of the fire. In addition to these fires, NorthStar failed to develop and implement a radiation protection program at Vermont Yankee, resulting in an unplanned radiological intake, occurring during active work performance. The Navy's assessment of a Substantial Confidence rating for NorthStar's past performance is at odds with these non-cited violations.

63. ShipCycle, on the other hand, has demonstrated successful performance on its projects, and furthermore, ShipCycle's [redacted]. Indeed, ShipCycle's proposal demonstrated [redacted]. Furthermore, ShipCycle's proposal showed [redacted].

64. [redacted]. The Navy's finding that NorthStar's past performance was [redacted] to ShipCycle's is irrational and unsupported.

65. A best-value tradeoff that relies on the awardee's purported past performance [redacted] is only as sound as the evaluation that established [redacted]. Had the Navy reasonably evaluated [redacted], there is a substantial chance that it would have found ShipCycle's proposal [redacted]



[redacted]

[redacted] ShipCycle offers for the ability to successfully complete a nuclear-powered aircraft carrier deconstruction and disposal. As a result, this error prejudiced ShipCycle.

**PRAYER FOR RELIEF**

WHEREFORE, ShipCycle requests that this Court:

(i) Declare that the Navy's decision to award the contract to NorthStar was arbitrary and capricious, and an abuse of discretion;

(ii) Permanently enjoin the Navy from proceeding with performance of the awarded contract; and

(iii) Award ShipCycle such other and further relief as this Court may deem just and proper, including, without limitation, bid and proposal costs.

Dated: September 2, 2026

Respectfully submitted,

By: ______________________

Damien C. Specht
Morrison & Foerster LLP
2100 L Street NW
Suite 900
Washington, DC 20037
Phone: (202) 887-1574
Facsimile: (202) 887-0763

*Of Counsel:*

James A. Tucker
Thomas Lee
Morrison & Foerster LLP



[redacted]